MINOR *vs.* THE STATE OF GEORGIA.

[Warner, Chief Justice, being engaged in presiding over the senate organized as a court of impeachment, did not sit in this case.]

In Georgia, men are frequently as well known by their initials as by their given or christian names in full.   Hence, it will not be presumed that particular men are not thus known, and the court will not, on demurrer or motion, quash an indictment because only the initials of some of the grand jurors who found it appear prefixed to the surnames, as set out in the indictment.

2.  That a member of the grand jury who found the bill was legally incompetent must be proved, or all will be deemed competent.

3.  It is not required that the grand jurors insert their names with their own hands, but the names may all be in one hand-writing.

4.  A request to charge that a tippling-house is a house kept for the purpose of selling liquors by drams or small quantities to the public, and where men are accustomed to tipple, may be declined; and in lieu thereof, the court may charge that if liquors were given away by the drink or other small quantity at a particular house,

not one or two but every Sunday, and it was a usual and common thing on Sunday, it did not matter whether any pay was received or money given for the drinks, it was a tippling house.

5. Instead of charging a request that, under given circumstances, the jury can reject the whole testimony of a witness if they think proper, the court may substitute a direction to take all the enumerated circumstances into consideration in weighing the testimony. It is not good to tell the jury that they can *reject* testimony which the court has legally admitted. .

6. The house where the "Albany Glee Club" met and drank on Sunday was a tippling-house; and the owner was both the keeper of a tippling-house and a retailer of spirituous liquors.

Criminal law. Indictment. Jury. Tippling-house. Evidence. Charge of Court. *Certiorari*. Before Judge WRIGHT. Dougherty County. At Chambers. July 18, 1879.

Minor was placed on trial in the county court for the offense of keeping open a tippling-house on the Sabbath-day, and also for retailing without license. He was convicted in each case. He presented petitions for the writ of *certiorari*, alleging as erroneous the rulings set forth in the opinion. The writs were refused, and he excepted.

The cases were argued together in this court.

H. MORGAN, for plaintiff in error.

WM. OLIVER, county solicitor; D. A. VASON, for the state.

BLECKLEY, Justice.

The indictments were demurred to in due time, and the points against them may be considered as these three: that they gave the initials only, and not the full christian names of some of the grand jurors; that the foreman of the grand jury was over age, and his name was not in the jury-box; and that the names of the grand jurors were not inserted in the indictments by the jurors themselves, but were all in one and the same hand-writing.

1. However it may be elsewhere, in this state men are frequently as well known by their initials as by their given or christian names in full. 18 *Ga.*, 465. Many are even better known by the former than by the latter. Hundreds and thousands, no doubt, sign almost invariably with nothing for the prenomen but initials. The most solemn private and public documents are thus executed every day. Deeds and wills are so signed; and the same is true of pleadings, process, judgments, executions, levies, warrants, bills of exceptions, and official certificates. If, with us, initials do not constitute, or adequately represent, a given name, it is not improbable that more than half the instruments, public and private, executed within the state in the last fifty years are defectively signed. There seems no reason for overthrowing an indictment for a mode of writing names which has become interwoven with the whole business of the state and people, and the prevalence of which is attested by the records of every court, this court included. In the nature of things, letters of the alphabet are as well adapted as words to stand for and distinguish different persons of the same cognomen. Thus A. H. Brown, B. T. Brown and C. M. Brown, would serve quite as well to identify three members of the Brown family as Andrew H. Brown, Benjamin T. Brown and Charles M. Brown, and when by long use the initial forms are in fact as well known as the others, they will be just as certain as the others to suggest the right persons. And this is the great office and purpose of a name. If it is in common and familiar use, and stands to the mind as a sign or index of the person signified, what it wants in other respects is of no practical consequence. In impressing a name, no baptismal seal in requisite. The rule of law as to two names for the same person is, that either is sufficient when the individual is equally well known by the one as by the other; and there is, at this day, no substantial reason for not applying the rule between two usual and customary forms of writing a name. Without shutting the eyes to all the light that surrounds us,

there can be no presumption that particular men are less known by their initials than by their given names in full. And we are clear that the contrary presumption ought to be indulged where initials only are prefixed to the surnames of members of the grand jury in the indictments which they have found and returned. The persons whose names are in question are to be considered as themselves practicing and sanctioning that form.

2. As to the foreman, there was no evidence that he was over age or that his name was not in the jury box. Neither of these facts appeared on the face of the record or the pleadings, and if they existed, the demurrer could not reach them. As no incompetency was apparent, the court, in ruling the demurrer, had to presume that the foreman, as well as the rest, was competent.

3. It is a novel suggestion that each member of the grand jury must sign or insert his name with his own hand, and that some one member may not act as clerk, and do the clerical work of the body, as has been the immemorial usage in this state. The suggestion is pregnant with innovation, but barren of law.

4. The denial of a request to charge the jury is complained of, which request, we must say, contained an excellent definition of a tippling-house. Most probably it was taken from good authority; but the dictionary definition of a term is frequently the mere air of the music which the accused has attempted to execute with variations. Frequently, too, the variations are so luxuriant and ingenious that the air is much disguised, and to hum it over from the bench is but little assistance to the jury in following the real performance. It is something easier for an offender to baffle the dictionary than the penal code, for the former is perplexed with verbal niceties and shades of meaning, while the latter grasps in a broad, practical way at the substantial transactions of men. The Code offers no definition of a tippling-house. It deals with them as establishments too well known to need description, and simply prescribes a penalty for keeping them open on the Sabbath-day

or Sabbath-night. §4535. The court was not bound to
define tippling-house at all, but might, if so minded, have
left the jury to their own information and intelligence as
to the meaning of so common a term. The proposition
charged in lieu of the one requested is sound, and has the
merit of coming to the point and dealing with the actual
case as made by the evidence. To keep clear of the literal
definition of a tippling-house was what the defendant and
his associates set out to do, and it would have been idle to
try whether they had succeeded or not. The whole ques-
tion was whether, in departing from the usual mode of
tippling, the criminal elements were included or excluded.
The entire pressure of the case was upon the effect of the
departure.

5. To tell the jury that they can reject testimony which
has been legally admitted by the court, is not a felicitous
form of instruction. To withhold credit from a witness,
is not to reject his testimony, but to retain and disregard
it. What was substituted by the court in place of the
charge requested, was better than the language of the request

6. According to the evidence in the record, organized
and systematic tippling on the Sabbath-day, and retailing
of spirituous liquors as means to that end, were carried on
under cover of the resolutions and by-laws of the "Albany
Glee Club;" the house at which the club habitually met and
drank was a tippling-house, the owner of the house, who
was an officer of the club, and who received the contribu-
tions, purchased the liquors, and dispensed them by the
drink and otherwise, was both a retailer and a keeper of a
tippling-house. The instrument of social union was as
follows, the names of twenty-eight persons being subscribed
thereto:

"RESOLUTIONS AND BY-LAWS FOR THE GOVERNMENT OF THE ALBANY
GLEE CLUB."

" *Resolved*, 1. That this club shall be known as the 'Albany Glee
Club.'

" *Resolved*, 2. That this club, and we the members thereof, knowing
that it is in strict violation of the city as well as the state laws for any
dealer in spirituous or fermented liquors to sell on the Sabbath-day,

and not wishing to violate the laws in any part or sentence, nor to cause others to do so, and knowing that every laboring man or others who are in the habit of taking their social drinks during the week, wants and needs it on the Sabbath.

"*Resolved*, 3. That in order to comply with the laws in every particular, agree to pay the sums opposite our respective names, to a treasurer to be chosen by the club, on or before the Saturday preceding each Sabbath, for the purpose of purchasing the liquor necessary for the use of the club the following Sabbath.

"*Resolved*, 4 That the club shall have a president, secretary, treasurer, to be elected by a majority of the club on the first of each month, dating from the time of the first election.

"*Resolved*, 5. That it shall be the duty of the president to preserve strict order and see that no member shall so far forget himself as to become so intoxicated as to be boisterous on the streets as well as the club's place of meeting.

"*Resolved*, 6. That the office of secretary and treasurer shall vest in one man, whose duty it shall be to keep a strict account of all moneys received and disbursed by him. He shall produce bills of merchandize as vouchers to the club.

"*Resolved*, 7. That no member shall invite an outsider that has not paid his quota to the benefit of the club, without the consent of two-thirds of the members present.

"We the undersigned members, cordially indorse the foregoing preamble with the amounts opposite our names."

Judgment affirmed.