STATE ex rel. EDWARD T. YOUNG v. MINNESOTA CLUB.[1]

January 22, 1909.

Nos. 15,690—(21).

**Section 1519—"Person."**

A social organization, or club, incorporated under the laws of this state, is a "person," within the meaning of section 1519, R. L. 1905.

**Sale of Liquor by Social Club.**

The distribution of intoxicating liquors in less quantities than five gallons by such a club to its members, for a consideration, though without profit, constitutes a "sale" within the meaning of that section, and is prohibited, unless protected by license as provided by law.

Prior to 1907 defendant club was never required to take out a license to sell liquor. At that time the public authorities notified it to do so. The question whether it was required to do so was thereupon submitted to the district court for Ramsey county on an agreed statement of facts. The court, Kelly, J., decided in favor of defendant, and from the judgment entered, plaintiff appealed. Reversed.

*Edward T. Young,* Attorney General, and *C. Louis Weeks,* Special Assistant to Attorney General, for appellant.

The transaction was a sale. State v. Lockyear, 95 N. C. 633; People v. Law, 203 Ill. 127; State v. Essex Club, 53 N. J. L. 99. The learned district judge indicated that he based his decision on the ground that it is not "such sale or furnishing of liquor as under the statutes is unlawful unless first licensed." The appellant contends the sale is unlawful unless first licensed.

It may be conceded that the club house of the respondent is not a public drinking place and that section 1545 does not apply to it, with-

[1] Reported in 119 N. W. 494.

out in any degree impairing the contention of the state that section 1519 requires a license as a condition precedent to making a sale. The club house is certainly not a saloon, public bar, or place of public resort. Koenig v. State, 33 Tex. Crim. 367; Grant v. State, 33 Tex. Crim. 527. Nor, probably, is it a place of business within the purview of section 1545. The state contends any sale without a license is prohibited.

*C. D. O'Brien* and *W. H. Lightner,* for respondent.

The liquor license law is a police regulation solely. City of Rochester v. Upman, 19 Minn. 78 (108); State v. Cassidy, 22 Minn. 312; State v. Deusting, 33 Minn. 102; State v. Funk, 27 Minn. 318; State v. Robinson, 101 Minn. 277, 287; Claussen v. City of Luverne, 103 Minn. 491; Leavitt v. City of Morris, 105 Minn. 170. The liquor license law, being penal in character, is to be strictly construed. Ferch v. Victoria Ele. Co., 79 Minn. 416; 26 Am. & Eng. Enc. (2d Ed.) 658; 13 Am. & Eng. Enc. (2d Ed.) 55; Sutherland, St. Const. § 208; State v. Walsh, 43 Minn. 444.

R. L. 1905, § 1519, et seq., are intended to regulate the retail business or traffic in intoxicating liquors conducted for a profit and are not applicable to respondent. It is not contrary to the law and public policy of this state to use or drink intoxicating liquor. The object of the license law is to regulate the retail business conducted for a profit. See sections 1519, 1521, 1522, 1532, 1535, 1543, 1545 and 1564; State v. Deusting, supra; State v. Orth, 38 Minn. 150, 154; State v. Bates, 96 Minn. 110, 114, 115; State v. Jones, 88 Minn. 27. The appellant in its brief concedes that respondent is not a public drinking place; that section 1545 does not apply to it; that the club house is not a saloon, public bar, or place of public resort and that it is not a "place of business" within section 1545.

The very great weight of authority is that under liquor license laws, similar to our own, the transactions of respondent do not constitute sales within the meaning of such laws, which are designed to regulate the retail business conducted for a profit. People v. Adelphi Club, 149 N. Y. 5; Klein v. Livingston, 177 Pa. St. 224; Com. v. Pomphret, 137 Mass. 564; Com. v. Ewig, 145 Mass. 119; Seim v. State, 55 Md. 566; State v. St. Louis, 125 Mo. 308; State v. McMaster, 35 S.

C. 1; Piedmont v. Com., 87 Va. 540; Tennessee v. Dwyer, 11 Lea, 452; Barden v. Montana, 10 Mont. 330; Koenig v. State, 33 Tex. Crim. 367; Manassas v. Mobile, 121 Ala. 561; State v. Boston, 45 La. An. 585; 17 Am. & Eng. Enc. (2d Ed.) 361; 24 Am. St. 35–50.

LEWIS, J.

Does the serving of liquors to its members by the Minnesota Club, of St. Paul, subject the club to the necessity of obtaining a license, pursuant to the provisions of chapter 16, R. L. 1905? The cause was argued upon the following agreed statement of facts:

"The Minnesota Club is a corporation organized solely for social purposes, and not for pecuniary profit, under the statutes of the state applicable to such organizations. It was created and has existed ever since 1884. It maintains a club house building, which it owns. The articles of incorporation, constitution and by-laws of said club are hereby referred to for greater certainty, and may be used on presentation of the question herein involved by either party. Ever since its organization said corporation has maintained its club house, and carried on therein a restaurant, and served its members with meals and wines and liquors upon their request. It always has and maintains certain rooms and sleeping apartments for the use of its members, and is conducted as a bona fide social club.

"Its membership consists of resident and nonresident members, each of whom is elected under the provisions touching membership found in the constitution and by-laws. No person, not a member of such club, can enter upon its premises, or be entertained therein, save that nonresidents of Ramsey county may be admitted to the privileges of said club for a period not exceeding ten days upon a written invitation of a member in good standing and a written card issued to such visitor. During the period of such visit, such visitor is entitled to all the privileges of the club, but the person introducing him is responsible for him. Residents of Ramsey county, not members of the club, may be entertained in one of the private dining rooms of said club, at a dinner given by some member for not less than four persons, and such persons attending such dinner as such guests are not entitled to any of the privileges of the club whatever, nor may they enter upon any

part of said club except such private dining room, and the entrance to and egress therefrom.

"Each member of said club, besides his initiation fees, pays annual dues; resident members $60 per annum, and nonresident members $30 per annum. The club transacts all its business in its corporate name, through regularly chosen officers. It furnishes its members and their guests with meals to order, also with cigars, or any kind of intoxicating liquor to order, but only serves liquor within the club by the drink, and therefore in quantities of less than five gallons. The meals, cigars, or liquors so served are taken from the common stock of such articles owned by the club, and are charged to the member ordering the same at such price as will reimburse the club for the cost of the article furnished and the expense of the service; the aim being to make the club self-sustaining, but not to make a profit on its gross business. Members are required to pay their accounts for meals, cigars, or liquors monthly.

"Up to this time no license for the sale of liquor has been required of said club by the city of St. Paul, in which said club is situated; but said club has always paid the special tax imposed by the United States government for the sale of liquors."

The learned trial court was of opinion that the object of this class of legislation has always been to control the traffic in liquors as a business, and has no application to a purely private social club, where the dispensing of liquors is a mere incident to the main purpose of the organization. We believe this is the first time in the history of this state that the courts have been called upon to construe the statute with reference to such organizations, and the importance of the question demands that it be considered from the various points of view suggested at the argument. The Minnesota Club is a corporation duly created and existing under the laws of this state. It is a legal entity, and within its corporate powers transacts business in the commercial world and with its members with the same effect as any other corporation. As a corporation the club purchases liquors at wholesale, keeps them in stock, and upon application furnishes its members liquor in quantities less than five gallons to be drunk upon the premises. The trial court was of opinion that the drastic measures of the statute could not have been intended to apply to social clubs, for the reason

that it would be detrimental to the purpose of such institutions and subject them to such espionage and restrictions as to practically interfere with the main object of their existence.

From territorial times one continuing purpose runs through the legislative expression on this subject, and that is to prohibit absolutely the sale or dispensing of intoxicating liquors, less than a certain quantity, unless duly licensed. By chapter 8, p. 43, Laws 1849, the sale of intoxicating liquors without a license in quantities less than one quart was prohibited. This remained unchanged until 1858, when the amount was increased to five gallons, at which time the language of the statute was: "If any person or persons shall sell or barter any spirituous, vinous or fermented or malt liquors, in less quantity or quantities than five gallons, without first having obtained license therefor," etc. Pub. St. 1849–1858, c. 18, § 20. In the revision of 1866 (G. S. 1866, c. 16, § 4) the prohibition was expressed as follows: "Whoever sells or barters any spirituous, vinous, fermented, or malt liquors in a less quantity than five gallons, without first having obtained license therefor," etc. The same provision was carried into the statutes of 1878 (G. S. 1878, c. 16, § 4), and keepers of drug stores, dispensaries, apothecary shops, or other business houses in any manner dealing in spirituous, vinous, or malt liquors, for whatever purpose, were brought within the provisions of the law (section 16). In 1866 (Laws 1866, p. 84, c. 40), for the first time the provision prohibiting the sale of liquors at the State Capitol, and the hour for closing saloons, was introduced, and chapter 16, § 10, G. S. 1878, prohibited the sale to minors. In 1887, the license fee was regulated (Laws 1887, p. 40, c. 5), and what is known as the "blind pig" law was enacted (Laws 1887, p. 44, c. 7), and it was provided that pharmacists and druggists might dispense liquors in good faith for medicinal purposes upon a written prescription of a reputable and duly licensed physician (Laws 1887, p. 45, c. 8). By Laws 1889, p. 67, c. 21, the sale of liquor in the vicinity of the State Fair grounds was prohibited. Section 4, c. 16, G. S. 1878, was carried into section 1993, G. S. 1894; but the revisers of 1905 condensed the various provisions, and section 1519, R. L. 1905, is the statute now in force. It reads:

"Any person who shall sell any intoxicating liquors in quantities

less than five gallons, or in any quantity to be drunk upon the premises, except as hereinafter provided, is guilty of a misdemeanor," etc.

Students in any educational institution in the state, intoxicated persons, habitual drunkards, spendthrifts, and improvident persons are all placed under the protection of the law. The line separating the retailing from the wholesaling of intoxicating liquors is a certain quantity—five gallons—and brewers and wholesalers are not required to take out a license so long as they do not sell at retail.

As a result of the evolution of public sentiment on this question, as voiced in the legislation above outlined, it is evident that the unrestrained sale of intoxicating liquor has been regarded as an evil and that the public good requires that it should be restrained. Absolute prohibition has not been adopted as the most effectual method, but prohibition to a certain extent is the principle now established as the most effective method of restraint. Up to the present time the people have been satisfied to apply the principle of prohibition to a limited extent, viz.: First, that no liquor in any quantity, under any conditions whatever, shall be sold to certain persons, and none shall be sold in any quantity to any person within certain specified districts; second, that no liquor shall be sold in quantities less than five gallons, or in any quantity, to be drunk upon the premises, unless licensed according to law. "Any person," as used in the statute, includes all persons and parties, unless excepted. There are no express exceptions in favor of social clubs, and, considering the history and purpose of the law, we are of opinion that no such exception is implied.

There are many decisions from the different state courts bearing upon the subject, and in several instances the statutes differ in some essential feature. In one class of cases the question turned upon whether a commercial club was a public place, within the meaning of a statute prohibiting unlawful games of cards in public places. Grant v. State, 33 Tex. Crim. 527, 27 S. W. 127. The court was of opinion that the commercial club under consideration was not open to the public generally, and hence was not a public place, within the meaning of the statute. Koenig v. State, 33 Tex. Crim. 367, 26 S. W. 835, 47 Am. St. 35, is to the same effect. There the statute made it a misdemeanor for any person to play at any game of cards at any

house for retailing spirituous liquors, storehouse, tavern, inn, or any other public house, or in any street, highway, or other public place. It was held that a clubroom of a private incorporated social club, in which liquors were sold to members only, was not a public house for retailing spirituous liquors, within the meaning of the statute. Again, in State v. Austin Club, 89 Tex. 20, 33 S. W. 113, 30 L. R. A. 500, a license tax was imposed upon persons engaged or engaging in the business of selling spirituous liquors, and it was held that the law did not apply to a social club where liquors were sold to its members only, and the decision is based upon the ground that the tax was not intended to apply to any one not engaged in the selling of spirituous liquors as a business. The club was not engaged in the retail business, and hence it was not within the act. To the same effect is Manassas Club v. City, 121 Ala. 561, 25 South. 628, where the statute required a license tax to be paid by persons or corporations trading or carrying on any business, trade, or profession, and it was decided that the club was not within the act, upon the ground that the business intended to be taxed was one carried on for a livelihood or profit. However, in Martin v. State, 59 Ala. 34, it was held that a commercial club was engaged in retailing liquors, within the meaning of the statute which prohibited the sale of intoxicating liquors without a license, and the court called attention to the difference between that statute, which was aimed at any sale, and statutes with reference to the business of retailing as such.

A case often referred to is that of Piedmont Club v. Com., 87 Va. 540, 12 S. E. 963, where it was held that liquors kept by a club in its rooms, and served only to its members and their invited guests, without profit, was not a sale of intoxicating liquors within the meaning of an act which provided that no person, corporation, company, firm, partnership, or association should engage in the business of selling liquors, etc., without obtaining a license. The same view was taken in Barden v. Montana Club, 10 Mont. 330, 25 Pac. 1042, 11 L. R. A. 593, 24 Am. St. 27. In Seim v. State, 55 Md. 566, 39 Am. 419, the court was of opinion that the disposing of beer on Sunday to members of a social club was not in violation of a statute which prohibited the sale of intoxicating liquors on the Sabbath; but. in the later case

of State v. Easton, 73 Md. 97, 20 Atl. 783, 10 L. R. A. 64, it was distinctly held that a social club was within the meaning of the statute, which prohibited any person from selling spirituous liquors in certain districts in a certain county, and the court referred to Seim v. State, supra, as follows: "In that case the party was indicted for selling and disposing of beer on Sunday; and it was supposed that because the license laws had never been construed to apply to social clubs, that therefore the law restraining the sale and disposition of liquor on Sunday was not intended to apply to them. But no such reasoning can apply in this case. Here the law is an unqualified prohibition to every one within the districts mentioned; and there can be no pretense that social clubs, such as the defendants in this case, were intended to be exempted from the operation of the law."

The case of State v. St. Louis Club, 125 Mo. 308, 28 S. W. 604, 26 L. R. A. 573, was decided upon the ground that a social club was not a "person," within the meaning of the dramshop act to take out a license as a dramshop keeper. The decision seems to have been based upon the peculiar wording of the law. A dramshop is not a place where liquor is sold by a club incidentally to its members. A dramshop is a place where a party is engaged in the sale of intoxicating liquors as a business. A similar case is State v. McMaster, 35 S. C. 1, 14 S. E. 290, 28 Am. St. 826. The statute prohibited the sale of intoxicating liquors, except as the same might be licensed by incorporated cities, towns, and villages, and permitted such authorities to grant licenses at retail inside incorporated limits to keepers of drinking saloons and eating houses apart from taverns, and required all such persons to expose their license to public view in the chief place of making sales, and that all such sales should be in a room fronting the public street, without any screen, curtain, or other device for preventing the passing public from fully viewing what may be transpiring within. The court was of opinion that social clubs were not within the scope of the statute, because they were not organized for the purpose of engaging in the business of dispensing liquors for profit.

As we understand the case of State v. Boston Club, 45 La. An. 585, 12 South. 895, 20 L. R. A. 185, it was decided upon the same gen-

eral ground. The statute construed in Klein v. Livingston Club, 177 Pa. St. 224, 35 Atl. 606, 34 L. R. A. 94, 55 Am. St. 717, reads as follows: "It shall be unlawful to keep or maintain any house, room or place, hotel, inn or tavern, where any vinous, spirituous, malt or brewed liquors, or any admixture thereof, are sold by retail, except a license therefor shall have been previously obtained as hereinafter provided." It was held that, where the steward of a social club was authorized to purchase and distribute intoxicating liquors to its members without profit, this did not constitute a sale within the meaning of the act. The New York and Massachusetts courts have passed upon statutes similar to our own, and came to conclusions directly adverse to the view we entertain. The leading New York case is People v. Adelphi Club, 149 N. Y. 5, 43 N. E. 410, 31 L. R. A. 510, 52 Am. St. 700, where the statute under consideration provided that any person who should sell intoxicating liquors in less quantity than five gallons, to be drunk or used upon the premises, without a license, should be guilty of a misdemeanor. The court squarely decided that the sale of liquors by the club to one of its members was not a sale within the meaning of the act. In Massachusetts the statute read that no person should sell, or expose or keep for sale, spirituous or intoxicating liquors, except as authorized by law; and in Com. v. Pomphret, 137 Mass. 564, 50 Am. 340, it was decided that incorporated social clubs were not within the statute. This ruling was adhered to in Com. v. Ewig, 145 Mass. 119, 13 N. E. 365, where the only question for trial was the good faith of the club.

In the following cases the statutes involved did not materially differ from our own, and the position was distinctly taken that clubs were within the statutes and that the distribution of liquor by a club to its members constituted a sale. In Newark v. Essex Club, 53 N. J. L. 99, 20 Atl. 769, the statute prohibited the sale of spirituous liquors in quantities not less than five gallons at any time, at any place within the city of Newark, without having a license. The Essex Club was incorporated under the laws of the state, and liquors were kept and furnished to members by the steward upon order therefor. Settlements were made at the end of each month, and no one but a member paid for liquors. There was no intention to make any profit, and the club was conducted in good faith, not intending to violate the

liquor laws. It was held that the liquor belonged to the club, and that, when furnished to a member to be drunk upon the premises, a sale was effected within the meaning of the law. A social club incorporated under the laws of the state of Michigan (Laws 1887, p. 446, No. 313, § 2) is within the scope of the liquor laws, which define "retail dealers" as follows: "Retail dealers of spirituous or intoxicating liquors, and brewed, malt and fermented liquors, shall be held and deemed to include all persons who sell any of such liquors by the drink, and in quantities of three gallons or less, or one dozen quart bottles or less, at any one time, to any person or persons." People v. Soule, 74 Mich. 250, 41 N. W. 908, 2 L. R. A. 494. The supreme court of North Carolina, in State v. Lockyear, 95 N. C. 633, 59 Am. 287, held that the furnishing of liquor to the members of a duly incorporated club by its steward, without profit, constituted a sale of such liquor. To the same effect is State v. Neis, 108 N. C. 787, 13 S. E. 225, 12 L. R. A. 412. In Georgia the statute provided a penalty for keeping open a tippling house on the Sabbath day, and in Mohrman v. State, 105 Ga. 709, 32 S. E. 143, 43 L. R. A. 398, 70 Am. St. 74, the supreme court held that an incorporated social club was subject to the provisions of the act. In Alabama the statute prohibited the keeping open of a barroom or other place for the sale of liquors on Sunday, and the supreme court of that state, in Beauvoir Club v. State, 148 Ala. 643, 42 South. 1040, 121 Am. St. 82, held that an incorporated private social club was within the purview of the act. The Maryland Club, a duly incorporated social club, was held to be subject to the penalty imposed by statute for selling liquor to its members on the Sabbath day. State v. Maryland Club, 105 Md. 585, 66 Atl. 667. In South Dakota the statute required every person engaged in selling liquors to annually pay a certain sum for license, and the court held that an incorporated commercial club was subject to the provisions of the act that the club was the owner of the liquor dispensed to its members, and that the method of distribution by means of checks upon which settlement was made from time to time, constituted a sale, although the business was conducted without profit. State v. Mudie (S. D.) 115 N. W. 107. The supreme court of Illinois has also passed upon this question, and held that a similar arrangement for the distribution of liquor among the members of a duly incorporated social club constitutes

a sale. People v. Law & Order Club, 203 Ill. 127, 67 N. E. 855, 62 L. R. A. 884. To the same effect is South Shore Country Club v. People, 228 Ill. 75, 81 N. E. 805, 12 L. R. A. (N. S.) 519, 119 Am. St. 417.

As we understand the Pennsylvania, New York, and Massachusetts decisions, they follow the principle first announced in the English case of Graff v. Evans, 8 Q. B. Div. 373, decided in 1882. From the meager report of the facts in that case it does not appear whether the Grosvenor Club was an incorporated organization or a partnership; but the court took the position that the liquor distributed by the club to its members did not belong to the club as a legal entity, but was the property of the members of the association in common, and hence, when the manager or steward delivered the liquor to one of the members, it did not constitute a sale, for the reason that a party cannot be charged with selling to himself property which he already owns. In a later English case, Newell v. Hemingway, 58 L. J. (1889) Magistrates Cases, 46, the club was a limited company organized for the purpose of providing a club house, hotel, and other conveniences for the use of the club. Newell, not a member, furnished liquors to the members of the club, for which he was paid. Lord Coleridge, C. J., was of opinion that liquors constituted a part of the refreshments, one of the purposes for which the club was organized, and that Newell was merely acting as the agent or representative of the directors in distributing the liquor, and that such distribution did not constitute a sale by him. Manisty, J., concurred, upon the ground that the liquors belonged to the members of the club and that the distribution thereof among the members by a designated party did not constitute a sale by the manager of the club to the members. In a still more recent case, Davies v. Burnett, L. R. [1902] 1 K. B. Div. 666, an attempt was made to hold a waiter of a working-men's club criminally liable for selling liquors to the members. The court followed Graff v. Evans, supra, and assumed that the liquor was owned in common by the members of the club, and the particular question under discussion was whether the waiter was entitled to furnish liquor to one of the members through the agency of his wife, to be taken from the premises, and the court held that he was not liable for so doing. In the Pennsylvania, New York, and Massachusetts cases, the clubs were

certain corporations, legally constituted under the state laws, and we cannot accept the conclusion that under such circumstances the liquor did not belong to the club, but was owned by the members in common. In People v. Adelphi Club, supra, it was stated that, while the property and supplies were technically owned by the club, yet each member was in equity an equal owner in common. We fail to see the force of this argument. If such a corporation is authorized to purchase and own the property necessary to carry on its business, the title thereto vests in the corporation to no less an extent than does title to property owned by any corporation engaged in any line of business.

It will thus be seen that the cases relied upon by respondent either follow the English rule that the distribution of intoxicating liquors to club members does not constitute a sale, for the reason that the members are the joint owners of the property and are merely distributing to themselves property which they already own, or are based upon peculiar statutes which fairly indicate that the legislature only intended to make the license law apply to the retail of intoxicating liquors, where it was carried on as a business for profit as a means of livelihood. Whatever may be the proper application of the statute to voluntary associations where property is held in common, the English rule has no application where the organization is a legally constituted corporation. The statute makes no express exception in favor of such corporations, and, considering the purpose sought to be accomplished in restraining the distribution of intoxicating liquors, as expressed in the plain terms of our statute, we fail to discover any implied exceptions.

Reversed.

ELLIOTT, J. (dissenting).

Instead of proceeding as in ordinary cases and charging a violation of the criminal law, the parties stipulated the facts, as authorized in civil cases by section 4286, R. L. 1905. The proceeding, then, can be sustained only on the theory that the club is charged with maintaining an unlicensed drinking place, which may be abated as a nuisance by injunction or other legal proceedings. It follows that the judgment about to be entered determines that the Minnesota Club is conducting an unlicensed drinking place which is a public nuisance. The statute

provides that every person who directly or indirectly, by himself or by combining with others, shall keep an unlicensed drinking place, is guilty of a misdemeanor, and shall be punished by a fine of not less than $50, or imprisonment in the county jail for not less than thirty days. The Minnesota Club was authorized under the authority of the state for the purpose stated in its charter, and for twenty four years it, like other social clubs of the same character, has existed without any one discovering that it was a public nuisance and all its members criminals. I feel very certain that the liquor license laws were never intended to apply to such a club. If the practical construction, which for more than a generation has been placed on the statute, is wrong, it is a very easy matter for the legislature so to declare.

The opinion of the court rests on a very narrow and literal construction of the language of a single section of a statute, which itself constitutes but a part of a body of legislation designed to regulate the retail liquor business. The United States government, for the purpose of raising revenue, levies a tax on all sales, and leaves the matter of the regulation thereof to the state. Minnesota has not made the drinking of liquor a crime. It does not even require a license from those who desire to sell intoxicating liquor at wholesale. Now, the sale of a pint of whiskey can be no more inherently contrary to public policy than is the sale of five gallons of the same article. The reasons which justify freedom in one case and stringent regulation in the other are found in the different conditions under which the sales are made. Experience has shown that the unregulated sale of liquor at retail leads to the development of undesirable places, which become the resorts of evil-doers and centers of disorder. The state may, by virtue of its general police power, prohibit the traffic entirely, or attempt to control the evil by merely restricting and regulating it. In view of the divided sentiment of the community as to the extent of the evils which result from the traffic, it has been the policy of this state to allow the business to be carried on under carefully defined restrictions as to persons, places, times, and facilities for inspection and control.

Without proper police supervision, the retail liquor traffic would be intolerable. To be endurable, it must be conducted under the eyes of the authorities, and such supervision necessitates extra expense and

trouble, the burden of which should be borne by the traffic instead of the general public. In order to cover this expense, those who engage in the business are required to secure a license and pay for the privilege an amount which will fairly reimburse the public for the extra expense and trouble incident to the regulation. From the concessions made in the record presented in this case it is apparent that· what the state is here seeking is revenue, and not regulation. But the Minnesota statute requiring a license for certain kinds of sales is a police and not a tax measure. Its purpose is regulation, not revenue. Claussen v. City of Luverne, 103 Minn. 491, 115 N. W. 643, 15 L. R. A. (N. S.) 698; Leavitt v. City of Morris, 105 Minn. 170, 117 N. W. 393; City of Rochester v. Upman, 19 Minn. 78 (108); State v. Cassidy, 22 Minn. 312, 21 Am. 765; State v. Deusting, 33 Minn. 102, 22 N. W. 442, 53 Am. 12; State v. Funk, 27 Minn. 318, 7 N. W. 359; State v. Robinson, 101 Minn. 277, 112 N. W. 269. The license fee is imposed, not as a tax, but as an incident of the police power. City of Rochester v. Upman, supra. The justification of the exercise of the police power is found in the necessity for the regulation of the retail liquor business —not in the mere fact that A. sells to B. a gill, instead of five gallons, of whiskey.

A study of the Minnesota legislation upon this matter makes it perfectly clear that the purpose was to frame a body of laws which should control and regulate the retail liquor traffic when conducted with a view to profit. That idea has always been in the mind of the court. As said in State v. Orth, 38 Minn. 150, 36 N. W. 103: "All the provisions of the laws in regard to procuring the license, the contents of the license, and the regulating of the business, point unequivocally to the retail trade, * * * and, taking the laws as a whole, we conclude the legislature did not intend to depart from the former policy of the state, and require licenses from any but the retail trade." Similar language was used in State v. Jones, 88 Minn. 27, 92 N. W. 468, and State v. Bates, 96 Minn. 110, 104 N. W. 709, 113 Am. St. 612. Chapter 16, R. L. 1905, when read as a whole, cannot be considered in any other light. It contemplates that there are certain persons who desire to engage in the business of selling intoxicating liquors at retail. It opens with the general statement that "any person who shall sell any intoxicating liquor in quantities less than five gallons, or

in any quantity to be drunk on the premises, except as hereinafter provided, is guilty of a misdemeanor." The words "sell" and "sale" are declared to include all barters, gifts, and all means of furnishing liquor in violation or evasion of the law. The general prohibition must be read in the light of what follows in the same statute. A pharmacist may sell intoxicants on the prescription of a physician, and any other person who is duly licensed may sell at certain times and places to certain persons only. Certain persons only may be licensed. The conditions show that the legislature had in mind the selling of liquor at retail. Otherwise, why so carefully provide for an investigation into the character of the licensee? Why limit the right of the licensee to sell at any place other than that referred to in the license?

The applicant must file with the proper officer a written application, stating the place for which a license is desired and the date from which it is to run. The officer must then give two weeks' published notice of the application, specifying the applicant, a description of the room for which the license is desired, and a time for a hearing on the question whether the application shall be granted. Application for what? For the privilege of selling a pint of liquor? Certainly not. The applicant must file a bond in the sum of $2,000, conditioned that he will not do certain specified things and generally observe the law. This contemplates that the applicant is going into the retail liquor business, and that the public is interested in the character of the applicant, as well as the place where the business is to be carried on. The character of the applicant is supposed to be of vital importance, and this can be so only on the theory that he is to be licensed to carry on a business. Hence it is provided that "* * * no license shall be granted to any person of known bad character, to the keeper of any house of prostitution, or place frequented by prostitutes or other disorderly persons, to the keeper of any gambling house or place where," etc. The places where sales may not be made are carefully defined, and the times when sales may be made are carefully limited. Sales may not be made on Sunday, or on special or general election days, or on any day between eleven o'clock p. m. and five o'clock a. m. The persons to whom sales are not to be made are also enumerated: "Any person duly licensed by the county board, or by the proper authorities of the municipality for which such license is issued, may sell such liq-

106 M.—34

uors in the room named in the license * * * in the manner and to the persons allowed by law, but not otherwise." The form of the license is prescribed, in order that the holder may be able to claim no rights free from the restrictions imposed by the statute. Every such license shall be for one year from its date, unless sooner annulled, shall specify the room in which sales are allowed, and shall state that the person named is authorized to sell such liquor only in such place and at the time, in the manner, and to the persons allowed by law. That the legislature was thinking of saloons and the retail liquor business appears from the provision that in cities of the first class "not more than five such licenses for places on one side of any block within the patrol limits of such city and fronting on such limits shall be granted."

The Minnesota Club is a corporation, and cannot secure a license in its corporate name. A corporation cannot legally take a license in the name of an agent or employee. It follows that the club cannot legally secure a license, and must cease to supply liquor to its members. I can find no authority in the statute for granting a license to sell intoxicating liquors in private. The statute contemplated public sales at a designated place, which must at all times be open to police visitation. There can be no privacy in a saloon. The ordinance of the municipality with reference to hours of closing, arrangement of rooms, screens, etc., applies to all public drinking places. The very purpose of such legislation is to prohibit privacy and retirement. If social clubs are obliged to secure liquor licenses, they must comply with the statutes and ordinances enacted for the government and regulation of the holders of such licenses. They become public drinking places, and subject to the laws regulating the same. All this, it is true, is of no consequence, if the legislature intended that such clubs should not serve liquor to members or their guests; but when seeking the legislative intention, it is proper to consider the consequences of any particular construction. The same legislature which enacted the license laws also authorized the incorporation of such clubs, and if the construction contended for by the state would produce results which are destructive of the clubs, it is fair to conclude that such a construction was not contemplated by the legislature.

The great weight of authority is contrary to the opinion expressed in the majority opinion. It is the established law in England that the

distribution of liquors to club members does not constitute a sale within the meaning of the license laws. It is useless to try to explain the cases away by fine distinctions between the statutes. In Graff v. Evans, 8 L. R. (1882), Q. B. Div. 373, Graff, the steward of the Grosvenor Club, was indicted for selling liquor to a member of the club under a statute (License Act 1872 [St. 35 & 36 Vict. c. 94] § 3) which provided that "no person shall sell or expose for sale by retail any intoxicating liquor without being duly licensed to sell the same." In holding that the transaction was not within the statute, Mr. Justice Field says: "The section must be construed by looking at the language used, and taking a large view of the object of the legislation. The legislature has come to the conclusion that it is inadvisable that intoxicating liquors should be sold anywhere without a license. The enactment is limited to 'sales' of intoxicating liquors, and only seems aimed at sales by retail traders, because the wholesale trader is not touched." In Newell v. Hemingway, 58 L. J. (1889) Magistrates Cases, 46, the manager of a limited company, the shareholders of which constituted the membership of the club, was held not liable criminally under the same statute for selling liquor to the members. In Davies v. Burnett, 1 K. B. 666 (1902) it was held that "where intoxicating liquor is sold by [the steward] of a bona fide workingman's club, not licensed for the sale of intoxicating liquors, to the duly authorized agent of a member for consumption by the member off the club premises, no offense is committed against section 3 of the licensing act, 1872, and the seller cannot be convicted for selling intoxicating liquors * * * without a license."

The same conclusion was reached by the supreme judicial court of Massachusetts. The statute (Pub. St. Mass. 1882, c. 100) contained the usual provision that "no person shall sell, or expose or keep for sale spirituous or intoxicating liquors, except as authorized by this statute." In Com. v. Pomphret, 137 Mass. 564, 50 Am. 340, it was held that the steward of a bona fide social club could not be convicted for selling liquors without a license. Mr. Justice Field said: "It is well known that clubs exist which limit the number of the members and select them with great care, which own considerable property in common, and in which the furnishing of food and drink to the members for money is but one of the many conveniences which the mem-

bers enjoy. * * * One inquiry always is whether the organization is bona fide a club with limited membership, into which admission cannot be obtained by any person at his pleasure, and in which the property is actually owned in common, with the mutual rights and obligations which belong to such common ownership, under the constitution and· rules of the club, or whether, either the form of the club has been adopted for other purpose, with the intention and understanding that the mutual rights and obligations of the members shall not be such as the organization purports to create, or a mere name has been assumed without any real organization behind it." Com. v. Ewig, 145 Mass. 119, 13 N. E. 365, was determined upon the question whether the club was a bona fide club, and not a mere devise to cheat the government of a license fee.

In People v. Adelphi Club, 149 N. Y. 5, 43 N. E. 410, 31 L. R. A. 510, 52 Am. St. 700, it was held that the furnishing of liquor to its members upon their written orders, at a price designed to cover the purchase price and disbursements of service, by a bona fide social club regularly organized under the statute for a legitimate purpose to which the furnishing of liquor to its members is merely incidental, and having a limited and selected membership, does not constitute a sale within the meaning of the liquor license law. So in Klein v. Livingston Club, 177 Pa. St. 224, 35 Atl. 606, 34 L. R. A. 94, 55 Am. St. 717, it was held that an incorporated club, organized and conducted in good faith with a limited and selected membership, owning its property in common, formed for social purposes, to which the furnishing of liquor is merely incidental, may furnish liquor to its members without first procuring a license. The court quotes with approval the following statement from Black, Intox. Liq., § 142: "Upon the whole, therefore, notwithstanding some conflicting rulings, the rational conclusion is that the intent must govern. On the one hand, if the object of the organization is merely to provide members with a convenient method of obtaining a drink whenever they desire it, or if the form of membership is no more than a pretense, so that any person, without discrimination, can procure liquor by signing his name in a book or buying a ticket or chip, thus enabling the buyer to conduct an illicit traffic, then it falls within the terms of the law. But on the other hand, if the club is organized and conducted in good faith, with

.a limited and selected membership, really owning its property in common, and formed for social, literary, or other purposes, to which the furnishing of liquor to its members would be merely incidental, in the same way and to the same extent that the supplying of dinners or daily papers might be, then it cannot be considered as within either the purpose or letter of the law."

The cases are reviewed in State v. St. Louis Club, 125 Mo. 308, 28 S. W. 604, 26 L. R. A. 573, where it was held that a corporate club is not a "person," within the meaning of the statute regulating the sale of intoxicating liquors, and that the sale of liquor by a bona fide social club not incorporated for profit is not a sale within the meaning of the law. "It seems to us," said Gantt, P. J., "that inasmuch as this club has been organized since 1878, it is not created for profit, and that the legislature must have been cognizant that many similar organizations had been created under the same statute, and if it had been the intention to require them to take out a liquor license it would have made some provision for it, or provided a license tax suitable to the case, as they cannot, under the dramshop act, exercise their other corporate rights. The club has pursued this method of providing refreshments for some fifteen years. Its right seems never to have been challenged before, although the dramshop act has remained substantially the same all these years."

Further discussion of the authorities is not possible with reasonable limitations of time and space. The views expressed in the cases cited from courts of the very highest standing are sustained in the following cases: Piedmont Club v. Com., 87 Va. 541, 12 S. E. 963; Seim v. State, 55 Md. 566, 39 Am. 419; State v. McMaster, 35 S. C. 1, 14 S. E. 290, 28 Am. St. 826; Barden v. Montana Club, 10 Mont. 330, 25 Pac. 1042, 11 L. R. A. 593, 24 Am. St. 27; Koenig v. State, 33 Tex. Crim. 367, 26 S. W. 835, 47 Am. St. 35; State v. Austin, 89 Tex. 20, 33 S. W. 113, 30 L. R. A. 500; and, in effect, State v. Boston Club, 45 La. An. 585, 12 South. 895, 20 L. R. A. 185. The courts of Illinois, Michigan, New Jersey, and North Carolina have reached a contrary conclusion. The law as declared in England, Massachusetts, New York, Pennsylvania, and other states has prevailed in Minnesota since social clubs were known. The statutes have always, so far as my knowledge extends, been held not to apply to such organiza-

tions.   This certainly has been the construction placed on them by the executive department.   It is true that the exact question has not before been presented to this court; but the trial courts have generally, if not universally, held that the question is always as to the good faith of the club.   I am not aware that it has been found particularly difficult to apply the law upon this theory.   Judge Kelly's decision leaves the law as it has always been in this state.   It seems to me that the change, if desirable, should be made by the legislature, and not by the court.

I therefore respectfully dissent.

JAGGARD, J. (dissenting).

I concur with the reasoning and result of the dissenting opinion.